Ms. Irwin, good morning. Good morning. May it please the Court, my name is Lauren Irwin, and along with my law partner, Heather Burns, it is my honor to represent Murad Ameen. May I please reserve three minutes for rebuttal, Your Honor? Yes. Thank you. The District Court erred in two major ways in this case. First, the Court required that the biased coworker or supervisor provide false or misleading information regarding the alleged misconduct to the final decision maker. Under both the U.S. Supreme Court case of Staub and this Court's case of Velazquez Perez, no such malfeasance is required. In the real world, a supervisor or a coworker who were motivated by retaliation will look for an excuse to get a plaintiff fired. When someone looks for an excuse, he or she can usually find one. The second major error that the Court made was when it ignored the evidence of malfeasance, intent, and pretext. It should be up to the jury to decide what motivated the coworker or supervisor to act in a way that caused the termination. Was the coworker motivated by retaliatory animus or was the coworker or supervisor simply motivated by the alleged misconduct? This Court has reversed summary judgment for an employer on issues of intent and motive, holding that in those cases, a jury should find the facts concerning those employees' claims. This case should go to the jury. I would like to go over some key facts. Murad Amin worked for Amphenol and its predecessor for nearly 12 years and was an excellent employee. His job was never in jeopardy until after he took FMLA leave and engaged in FMLA-protected activity in 2012. He did that because his wife had high blood pressure following her C-section and she needed his help to care for his new baby and his other child. Amin requested and was granted FMLA leave and then he verbally and informally extended that leave for another week, which was accepted by the company. He then verbally told his supervisors that he was declining required overtime in April, May, and June for the same FMLA-protected reasons. Declining required overtime for FMLA reasons is considered intermittent FMLA-protected FMLA leave. Coworker Connors and Operations Production Manager Pratt were frustrated that Amin was declining overtime and Pratt was angry, including just two days before the termination. Just as Amin was declining that overtime, Connors raised a tip to Pratt that Amin was misusing the time clock and leaving the building for an hour. Now three years before that, Amin had asked his immediate supervisor if he could combine his lunch and break and take a few minutes extra to have a meal with his wife. He had been doing it ever since and when they moved to electronic time cards, his supervisor suggested that he would have to punch in and out at a different time in order to combine the lunch and break. By the time Pratt suggested the termination to the final decision maker, Harrington, Pratt knew that Amin had permission to misuse the time clock to combine that lunch and break. Connors and Pratt also knew that Amphenol has lax enforcement of break time. They don't measure, they do not care to measure how much time employees take for break. But Connors and Pratt used this excuse to get Amin fired. At the termination meeting, Amin told Pratt and the HR Director Hartland that the real reason he was being fired was because he was declining overtime due to his wife's condition and Pratt asked him if he had proof of that. He also told them that other people took extra break time. They didn't even check the three other regular employees that were on his shift in the drill department to see if that was true. Never before and never again has Amphenol terminated an employee for simply taking extra break time. Now I'd like to discuss the court's first error. Malfeasance in false and misleading information is not required. The district court cited to the pre-Staub case of Corregia requiring that Connors and or Pratt had to supply Harrington with false or misleading information. That's not the Staub standard. Staub simply requires that Connors and or Pratt perform an act motivated by retaliatory animus that's intended to cause adverse employment action and that the act was the proximate cause of the termination. Let me ask you that because that puzzles me. I mean if they had an improper animus, a co-worker or a supervisor didn't like what someone was enforcing and they also discovered that the person had been embezzling major amounts of money from the company and so they said, aha, I've got the guy. They reported the embezzlement. It's true. He'd embezzled $500,000. Are you saying the company can't fire him? What you would look at is you would look at whether they would normally fire someone for that and you would look at what was their motivation. Were they motivated, at least in part, by the protected activity? When you say they, are you referring to the person who made the decision to fire for the $500,000 embezzlement or are you referring to the person who reported the embezzlement to the decision maker? The bad actor. So then you're saying that if the bad actor was improperly motivated, in other words didn't like the person, that they couldn't fire the person for the embezzlement. Well what you'd look at is how did this come to their attention? Why did they report it? Why did they escalate it? And you use embezzlements as an example but there are many cases in this circuit and other places where there is admitted misconduct that a company might decide is a reason to terminate people and you look at this court and other courts have looked at it and said is this something that typically gets people fired? But now you're changing, you're saying a factor that we need. I think you're saying in my embezzlement example they could fire the person because that's something they always fire someone for. Correct. So you've introduced an element. We need to find there's something in the record that would allow the fact finder to conclude that they would not always fire for this offense. Well we always should be looking at pretext in cases like this. Was this a pretext? Well no, I think you're saying it's an element, isn't it, to distinguish it from my embezzlement case. No, I think you would be looking at that in the pretext analysis which is would they normally escalate this? Had they escalated things like this before? Had they suggested or supported termination for this type of thing before? And the court never even got to pretext in this case because of the legal errors and the first one was saying it had to be false or misleading. There have been lots of cases and most recently just in May of this year in this court, the Velazquez-Perez case, where there was no evidence that there was false or misleading information given. There was evidence that the complaints had come from someone else, that they'd been confirmed by a different supervisor. The real issue was the coworker had escalated the issue and had suggested or recommended termination because the plaintiff had rebuffed her sexual advances in the Velazquez-Perez case. In this case we have Connors, when he saw his own subordinates taking extra break time, he never reported it or escalated it to anyone. He just told them to knock it off, don't do that anymore. We have Pratt, he never even observed whether people that worked for him took extra break time. They'd never escalated an issue like this before. They'd never recommended or supported a termination for this type of issue before. It's the same in the Kelly v. Correctional Med Services case, also a First Circuit case from 2013, where there was clear evidence, I think undisputed evidence, that the plaintiff had been insubordinate. But the question was, was it a convenient excuse that was used to get the plaintiff fired? Of course they can fire people for being insubordinate, but would they normally have done that in this case or was it motivated by the discriminatory animus? This test makes sense because someone with a motive can always find an excuse. Now even if this court were to find that malfeasance is required, which we do not think it is, the court ignored our evidence of malfeasance. Pratt didn't tell Harrington of Amin's recent protected activity. In this court's Tooley decision withholding information about the protected activity was considered sufficient evidence of malfeasance. Pratt also led Harrington to believe that a recent production error involved Amin trying to cover something up when he knew that that was not true. He was the one who wrote the warning and didn't give that exonerating information to Harrington, which allegedly she used and considered when she terminated Amin. And probably most importantly, Pratt did not tell Harrington that Amin's misuse of the time clock was done with Silva's permission. In Harrington's deposition testimony, the beginning of her deposition, she was outraged by the scheme or the ruse involved in misusing the time clock, punching in and out when you're there and going out at another time. And that's what really got her upset. Well, she found out during her deposition, because Pratt had never told her, that that was actually with Mr. Silva's permission. Well, then she sort of changed her tune to say, well, it was still, 15 minutes was still, you know, stealing from the company. Well, even after that, when the company looked at comparators, they said the only comparators are people who misuse the time clock without permission. Amin had permission. They never looked or cared whether employees took extra 15 minutes of break time. Never before and never again. Connors didn't tell Pratt that his own reports took extra break time. Could you explain what, in the company statement they gave him when they terminated him, that was revised, as I understand it, to include the statement that it was approved to combine his half hour unpaid lunchtime and 15 minute paid break time. So it looks like Pratt didn't know that when he drafted the first company statement, learned it, and so put it in the final company statement. Are you saying that Harrington never knew that? What she didn't understand, and it became very clear in her deposition, is she didn't understand that Mr. Silva had given him permission to punch in and out at a different time than when he left the building. She testified that he should have been wanding in and out and getting permission for his supervisor to change his time card. And we asked her at the deposition, you know, did you know that actually Mr. Silva had given permission for him to do exactly what he did to combine the lunch and break, and she did not know that. And then she moved on to say, well, well, you know, 15 minutes was still really bad and he should be fired, which is not consistent with anything they've ever done with anyone else at the company ever before or ever again. Now the court, the second big error was that it found that neither Pratt nor Connors were out to get Amin fired. First of all, in Staub, the court found that when a supervisor informs an employee responsible for terminating employees of alleged misconduct, a reasonable jury can infer that he intended that the plaintiff be fired. The evidence in this case, Pratt suggested to Harrington that Amin be fired and he wrote up the termination paperwork. Connors supported the termination, raised the tip up to Pratt, even though he'd never done anything like that before. Pratt spent an entire shift investigating Amin right after he got back from FMLA leave in a way that he had never done before, wrote up an extraordinarily detailed memo with photos that he'd never done before in his career. Pratt was after him and on him to get him to work overtime work. Neither Connors nor Pratt went to either Amin or even Amin's direct supervisor, Silva, to discuss this issue before they suggested termination. Thank you. Good morning, your honors. Jonathan Rosenfeld for Defendant Appellee, Amphenol Printed Circuits. The District Court Judge McCafferty properly granted summary judgment on Amphenol's motion for summary judgment because Amin's claim of FMLA retaliation, the court found two very important things. First of all, that it was undisputed that Harrington, the decision maker, was not aware of Amin's FMLA leave, which incidentally had taken place three months earlier and there had been a subsequent leave after that. It was a non-issue. And so absent successful invocation of the cat's paw theory, there could not be FMLA retaliation. Secondly, the judge ruled and found that there were no facts from which a reasonable jury could find retaliatory animus or causation, both of which are elements that Mr. Amin needed to prove. Are you saying that a jury couldn't find retaliatory animus by Pratt? Could not find retaliatory animus by Pratt. There was no evidence in the record of any FMLA retaliatory animus. No evidence in the record. If we take the chronology, in other words, this whole dust-up didn't start until after he found out that the fellow was going to decline even more over time. And then if you take his statement that upon learning that he was disappointed and then undertook this activity with a lot of vigor, innocent explanations for all of that, but also maybe not so innocent. Why isn't that the sort of stuff that a jury would weigh on that issue? Because you have to look at the whole chronology, Your Honor. So the whole chronology is Mr. Amin takes an FMLA leave without incident in March. He comes back from that leave and immediately wants to take and does take another leave, a personal leave. That personal leave had to be approved. And in that meeting, Mr. Amin gave an ultimatum and said, I'm taking a leave whether or not you approve it. Now, if Mr. Pratt was hell-bent on terminating him, he would have accepted that ultimatum and said, fine, that's a voluntary quit. I don't think they're claiming that he had motivation at that point. As I understand the theory, he has this conversation about yet another leave with this guy. And they kind of reach a deal that he says, well, you're going to have to do a lot of overtime when you get back. We're not happy about this. He then comes back and pulls the FMLA out again and refuses to do the additional overtime, which kind of understandably then ticks off Pratt. But the thing that's ticked him off is the guy using his FMLA to go back on the deal Pratt thought he had with him. Why isn't that enough for a jury to find something here? For a number of reasons. First of all, he didn't engage in another FMLA leave. He returned from his FMLA leave. He knew how to request FMLA leave. And when that was done in the current, he never was on another FMLA leave. In order for there to be FMLA leave, it would have had to have been mandatory. It was not mandatory. And Amin himself admitted, and I've included in our papers on page 15, at page 16 about the mandatory versus voluntary, and Mr. Amin admitted that there was only one mandatory requirement of overtime in the whole time that he was there. It wasn't this time. Counselor, before you move from that point, because this is the concept I'm trying to wrap my brain around here, this informal FMLA leave. He's saying that there's no real distinction between overtime that the employer expects and from the beginning of the contract. Beginning of his job there, it was understood that everyone was expected to do overtime. So there might be a fine distinction for tax purposes between mandatory and voluntary in that sense. But if it was the expectation that he would do overtime, are you saying that this informal FMLA was still not valid FMLA leave? Well first of all, Your Honor, there is no such thing as informal FMLA leave. This is a construct that the appellants have described. It is a construct because they don't cite any case law, and I was trying to put it into some kind of framework, and the only thing I could put it into would be extended or intermittent. Yes, and Mr. Amin had requested FMLA leave in March. If Mr. Amin needed additional FMLA leave, he knew exactly how to request it because he had just done so. He didn't request any additional leave. He came back, he was working full-time. It is part of Mr. Amin's job description that he's supposed to assist in facilitating staffing for overtime. He also agreed in the April 5 meeting in which he wanted to take an additional three and a half weeks of leave during the incredibly busy time for the company where its requirements had increased by 40%. He said that he would help out with overtime when he came back, and because of that, it was not unreasonable or unusual that Mr. Pratt, when he came back and the company was very busy and especially on second shift where he was the group leader, that he would ask him to work overtime. However, the overtime issue is a canard in this case because as you see from the termination document, overtime had nothing to do with it. That was not the issue at all, and we have an intervening event, a very important intervening event, which was the tip that was initially provided not by Connors and not by Pratt, but it was provided by two employees who were drill operators on Mr. Amin's shift, and he was supposed to be leading them. And they were upset that he would leave and be gone for an extended period of time when they were working very hard. But that's just another way of saying co-employees were upset because he took FMLA leave. No, they were upset because he wasn't there when he was supposed to be working. It had nothing to do with FMLA. It had to do with the fact that they learned that he was cheating on his time card. They told Connors. Connors then felt it obliged to tell Pratt. Are you talking about Silva's report? No, I'm talking about the tip. To Connors. The tip to Connors. Connors then, this is June, and this is why this is significant because the timing is not something that's of Pratt's making or Connors making. The timing is that's when they got the tip. So he passes it on to Connors, and Connors passes it on to Harrington. And I would submit to you that if Pratt had not passed that on, that this person had been cheating the company, and it turned out he had been cheating the company for two years, the disciplinary action would have happened to Pratt. This was something he's a manager. It's incumbent upon him to bring that up the chain of command. And he did so. Amin's testimony, though, is that other people were taking this kind of unauthorized break time. I mean, that's his testimony, so that's part of the record, evidence. And he was the only one who was disciplined for doing so. And the evidence in the record is that neither Harrington nor Pratt, none of them knew that there was any extra time. That in order for there to be knowledge and retaliatory animus, which is what you need for retaliation, they would have had to know that there was a comparator. They were not aware of any comparator at the time that they terminated. In fact, they didn't find out anything until this lawsuit, and then when they did an investigation subsequently, and they terminated somebody because of that. Judge Kayada, you asked a very important question and important distinction to the appellant about what would happen if somebody embezzled, and even if they had some animus, whether or not they would be precluded from terminating the person. And the answer to that is of course they wouldn't. And that's something that the appellant is wrong about, because this court's ruling in Coriglia, and also in Staub, that the key aspect is, did the retaliatory animus, did that influence the decision that was made by the decision maker? And that's why you need some sort of concealment of a fact, some false statement, something that induced it. Because if you simply have somebody reporting truthful information, which is what happened, Connors got a tip, he reported it to Pratt, Pratt reported it to Harrington, and Harrington then did her own investigation, went back through two years of records, and found that in fact the tip was correct. The claim's been made that Harrington was, that there's evidence that shows that Harrington was never told what is in paragraph two of the company's statement, as it was finally done, that he, his supervisor, had given him permission for at least half of what he was doing, the combining of the unpaid and lunchtime and paid break. Well, that's not true, because after the first draft of the termination letter, there, Pratt then spoke with Silva, found out this other fact, and communicated that to Harrington, and that's actually in the final termination document. So there's no evidence that Harrington's signature, though, is not on that final document. No, but Harrington was apprised, and that's why the document was changed. So Harrington did see the final document, even though her signature is not on there. I think, I think the, Mr. Mead's position is not that Harrington wasn't told at that point that Silva had given permission, but rather that she wasn't told that, of the scheme that Silva had approved to facilitate that extra amount of time. Yeah, and again... And on that point, she makes the point that in terms of how Silva, who at least Amin says knew everything, was disciplined versus him, in and of itself, self-sets up a comparator. In other words, Silva, according to Amin, approved all of this, including the extra 15 minutes that he denies. But then even notwithstanding that, he was given a discipline, whereas Amin was given termination. Two points on that, Your Honor. First, Harrington testified consistently and truthfully that her basis for termination was the fact that Amin had stolen for two years, that he had been paid for time that he didn't work for two years. It wasn't the methodology that was used, and that is consistent, and it's consistent in the document. Secondly, Silva is not a comparator, because in order to be a comparator, you would have to be similarly situated in all relevant respects. Mr. Silva did not steal from the company for two years. All Mr. Silva did was, he was being a nice guy, and when Mr. Amin asked him if he could combine his 30-minute unpaid break with his 15-minute paid break, he said that was okay. What he didn't allow him to do, I'm sorry. This person's testimony and there's somebody else's testimony. Amin's testimony is that Silva permitted it all, gave permission for it all. And if that is to be believed, then he is as guilty of allowing the theft as Amin is. But his discipline was different. Amin's testimony is not that he was given permission for it all. In fact, Amin's testimony, and we've done the comparison on page 15 of our brief, was that, and if you, for purposes of summary judgment, we take this as true, Mr. Amin said that Silva said that you can combine and take more time on top of that to make it up when you work. So you can combine your lunch, your lunch break, and the 15-minute break, but you then have to make it up. And as the district court found, and it's undisputed, Mr. Amin never made up that time. So even if you take Mr. Amin's version of events, he still was stealing from the company virtually every day for two years. And that's what the district court found. And Mr. Amin... He counters it by saying that if you're looking at the inference in a light most favorable to him, making up the work didn't mean make up the time, it meant making up the work. And he's saying that that's as reasonable an inference for summary judgment purposes as anything else. And respectfully, Your Honor, I would say that that's not a reasonable inference where he said to make it up, to do, you have to do extra work that's off the clock. That's the only, not, his allegation was, I just had to get my work done. Now, on its face that is ridiculous. Oh, so you can work two hours and get paid for eight, but as long as you feel you've gotten your work done, that's okay. But again, we have to go based on what was Mr. Amin's testimony. He would have liked his testimony to be, if I got my work done, that's what they put in their brief. But that's not what the court found, and that's not what his testimony is. Because his testimony is that he would make up the time, in the case of 9-12. And the district court found that, in fact, he didn't make up the time, and he did steal. There are no comparators. There's nobody else who was similarly situated to Mr. Amin. And incidentally, prior to this time, the company never had a situation like this. So it wasn't like they had something else to go on. They were free to make a determination that somebody who had stolen for two years deserved to be fired. Thank you. Thank you. Irwin, I believe you have three minutes. First, I'd just like to clarify on the FMLA overtime issue. We called it informal because that's how the company allowed Mr. Amin to extend his FMLA leave. But under the case law and the regulations, it's a plain English request. How does he ask for FMLA leave? He doesn't have to mention FMLA. He doesn't have to do paperwork if the company doesn't always require that, which they didn't hear. So it was a plain English request to be declining overtime for the very same reasons that he had done the formal request for FMLA leave. Secondly, the court and opposing counsel have ignored the testimony of Mr. Amin that he stated several times that he was given permission by Mr. Silva to have lunch with his wife and take a few minutes extra if he got the work done. The court took one isolated statement where opposing counsel pushed him to say time instead of work. He said time, and he never said time off the clock. Let me ask you this. Let's assume you're right, that there's a material dispute between Amin and Silva, and then Harrington sided with Silva's version of it. Isn't that enough? Because as I understand it, there's no evidence of any animus by either Silva or Harrington. So can't... The problem that we have in this case is they're refusing to recognize the real comparators in the case. So the real comparators, if Mr. Even if we were to say all they knew was he didn't have permission, we have tons of comparators. This was widespread at the company. According to Mr. Amin, if the real comparators, what they're saying is it wasn't the misuse of the time clock. That's what we heard them say today. But now you're saying Harrington must have the retaliatory, the improper animus because Harrington isn't firing the other comparators. Pratt, first of all, Connors knew that his own subordinates took extra break time, and he did nothing about it. He didn't escalate it. He didn't discipline them. But now you're back to saying Connors or Pratt has the animus. That's correct. Connors or Pratt have the animus. But then we're back to if Harrington doesn't have the animus, I think you've got to be conventionally back to your point that they fed her misleading information in some way. Well, they at least left out the fact, if she didn't know herself, they left out the fact that there was widespread lax enforcement of the break time policy. And we know, we have record evidence, not just Mr. Amin's testimony, we have the time clock records of even one of the people who allegedly raised the tip to Connors regularly took 15 minutes of extra break time. And Mr. Amin raises it at his termination meeting. Now, if we go back to the embezzlement example, if you're firing someone for embezzlement and that person says, you know, other people at this company have been embezzling, wouldn't you look, and if you cared, if that's a reason to terminate, would you look to see if other people were embezzling? They didn't care about the extra 15 minutes. That was with Mr. Pratt at that meeting. That shows Pratt didn't care. Thank you.